APR 23 2026 PM 12:49
FILED - USDC - FLMD - TPA

# United States District Court
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

BLAKE WARNER

v.

OFFICER HOLLY WOOD, INDIVIDUALLY;
OFFICER JAIR ROUSE, INDIVIDUALLY;
THE CITY OF TAMPA, FLORIDA; AND
DAVE KERNER, IN HIS OFFICIAL CAPACITY AS
EXECUTIVE DIRECTOR OF THE FLORIDA
DEPARTMENT OF HIGHWAY SAFETY AND MO-
TOR VEHICLES

Case Number 8:26-CV-1173-WFJ-TGW

JURY TRIAL DEMANDED

DECLARATORY RELIEF REQUESTED

PERMANENT INJUNCTIVE RELIEF REQUESTED

CHALLENGE TO THE CONSTITUTIONALITY
OF FLA. STAT. §§ 316.605 AND 316.2085(3)

## COMPLAINT

## INTRODUCTION

Blake Warner brings this civil rights action under 42 U.S.C. §§ 1983 and 1981 against Tampa Police Department Officers Holly Wood and Jair Rouse, in their individual capacities; against the City of Tampa; and against Dave Kerner, in his official capacity as Executive Director of the Florida Department of Highway Safety and Motor Vehicles. On November 4, 2025, Officers Wood and Rouse stopped Mr. Warner — an African-American man on a street-legal dirt bike — on a pretextual license-plate theory, deployed multiple patrol vehicles and a helicopter, detained him at the roadside for more than thirty minutes on investigative inquiries unrelated to the alleged plate condition, and, in retaliation for Mr. Warner's objection that the stop was racially motivated, extended the detention, issued a baseless license-plate citation under the

1



harsher of two parallel Florida statutes, and surveilled Mr. Warner by helicopter for approximately fifteen miles to his home. Officers also seized a second motorcycle owned by Mr. Warner and operated by a companion, without individualized suspicion. The Hillsborough County Court dismissed the resulting citation on April 20, 2026.

The stop is the foreseeable product of TPD's longstanding custom and practice of race-based enforcement against African-American residents on dirt bikes. Mr. Warner further challenges the facial and as-applied constitutionality of Fla. Stat. §§ 316.605 and 316.2085(3) under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)–(4).

2. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201–2202 and to award costs under 42 U.S.C. § 1988 and Fed. R. Civ. P. 54(d).

3. Venue is proper under 28 U.S.C. § 1391(b). All events giving rise to the claims occurred in Hillsborough County, Florida.

## PARTIES

4. Blake Warner ("Mr. Warner") is an African-American adult and a resident of unincorporated Hillsborough County, Florida.

5. *Defendant* Officer Holly Wood is a sworn Tampa Police Department officer, badge number 821. At all relevant times, she acted under color of state law. She is sued in her individual capacity.

2

6. *Defendant* Officer Jair Rouse is a sworn Tampa Police Department officer. At all relevant times, he acted under color of state law. He is sued in his individual capacity.

7. *Defendant* City of Tampa is a Florida municipal corporation. The Tampa Police Department is an operating department of the City and is not a separate suable entity. The City enforces Fla. Stat. § 316.2085(3) through the Tampa Police Department.

8. *Defendant* Dave Kerner is the Executive Director of the Florida Department of Highway Safety and Motor Vehicles ("FDHSMV"). In that capacity, he exercises administrative and supervisory authority over the Florida Highway Patrol ("FHP"), which enforces Florida's Uniform Traffic Control Law, Fla. Stat. ch. 316 — including Fla. Stat. §§ 316.605 and 316.2085(3) — on Florida's public roadways. He is sued in his official capacity only.

## FACTUAL ALLEGATIONS

### THE TRAFFIC STOP

9. On November 4, 2025, Mr. Warner, an African-American man, was operating a registered, street-legal dirt bike on public roads in Tampa, Florida. The dirt bike displayed Florida license plate SCGP33, mounted horizontally on the rear fender, visible and legible from well in excess of fifty feet.

10. Mr. Warner was riding at or below the posted speed limit and in compliance with all traffic laws. He was accompanied by a friend who was operating a second motorcycle owned by Mr. Warner.

11. At approximately 11:02 p.m., as Mr. Warner was traveling northbound on South Manhattan Avenue at West Gandy Boulevard, Officers Wood and Rouse initiated a traffic stop.

12. The stated basis for the stop was that the officers could not see a license plate on Mr. Warner's motorcycle. The basis was false. The plate was visible, unobstructed, properly mounted, and in compliance with Fla. Stat. §§ 316.605 and 316.2085.

13. TPD deployed three patrol vehicles to the scene, with a fourth en route, and a TPD helicopter that circled overhead during the stop.

14. Officers also stopped the second motorcycle, told its rider he was not free to leave, and detained the motorcycle at the scene for the duration of the encounter. *Defendants* had no reasonable suspicion or probable cause to believe the second motorcycle or its rider was involved in any traffic violation, crime, or unlawful activity.

15. When Mr. Warner asked Officer Rouse why such a large response had been deployed for an alleged license-plate violation, Officer Rouse answered, "because you guys run." When Mr. Warner asked Officer Rouse what he meant by "you guys," Officer Rouse smirked and answered, "humans."

16. Neither Officer Rouse nor Officer Wood knew Mr. Warner's name or criminal history. Mr. Warner had no prior contact with either officer. He pulled over promptly when lights were activated, cooperated throughout the stop, and did not attempt to flee.

## THE EXTENDED DETENTION

17. The alleged basis for the stop — an unreadable license plate — was, if valid, an administrative matter requiring only verification of the plate and, if warranted, issuance of a citation.

4

18. Officers Wood and Rouse instead detained Mr. Warner at the roadside for more than thirty minutes. Mr. Warner had a valid Florida license with a motorcycle endorsement. Mr. Warner's motorcycle was legally registered in Florida.

19. During the extended detention, officers asked Mr. Warner whether he had a motorcycle endorsement, despite holding his license in their physical possession with the endorsement displayed on its face and despite having run the license through their databases. Officers also asked Mr. Warner for proof of insurance on the motorcycle, despite Florida law not requiring motorcycle operators to carry insurance if wearing a helmet. Mr. Warner was wearing a full-face motorcycle helmet.

20. Mr. Warner asked Officer Rouse, on multiple occasions during the detention, what was taking so long. Officer Rouse each time responded that officers were writing the ticket.

21. Mr. Warner said to Officer Rouse, in words or substance: "Then give me my ticket so I can leave. My license is valid. The motorcycle is registered. I have no warrants. The basis of the stop was allegedly improper display of the tag. Give me my ticket so I can go." Officers refused and continued to detain Mr. Warner.

22. Officers' investigative inquiries during the detention were not reasonably related to the stated basis of the stop. No reasonable suspicion of any other offense supported the extension of the stop beyond the time required to verify the plate and issue a citation, so the officers could go on a fishing expedition to find something to charge Mr. Warner with.

## THE RETALIATORY CHARGING DECISION

23. During the stop, Mr. Warner verbally objected to the officers that the stop was pretextual and that he was being racially profiled because he is an African-American

man riding a dirt bike. The objection was non-threatening and directed at the officers' professional conduct.

24. Florida law provides two parallel statutes that cover an alleged motorcycle license-plate condition. Fla. Stat. § 316.605 applies to every motor vehicle registered and operated in Florida, including motorcycles, and is a non-moving civil infraction carrying a nominal fine and no driver's-license points. Fla. Stat. § 316.2085(3) applies only to motorcycles and mopeds, imposes additional motorcycle-specific plate-display requirements, and is a moving violation carrying a $1,000 civil penalty and the assessment of driver's-license points. Fla. Stat. § 316.2085(3) is quasi-criminal: a finding of guilt is a statutory predicate to criminal charges for subsequent violations.

25. No statute, regulation, or TPD policy provides any standard governing which of the two parallel statutes to apply. The choice is committed to the citing officer's unguided discretion.

26. After Mr. Warner voiced his objection, Officer Wood cited him under § 316.2085(3) rather than § 316.605. The choice imposed an approximately forty-fold-greater civil penalty, imposed driver's-license points, and imposed other collateral consequences that § 316.605 would not have. Nothing about Mr. Warner's conduct, history, or the alleged infraction provided any basis for the harsher charge not equally applicable to the lesser. Because the plate was visible and compliant with Florida law, no lawful basis existed to issue any citation at all, whether under § 316.605 or § 316.2085(3). The decision to issue any citation was made in retaliation for Mr. Warner's protected objection; the separate decision to select the harsher of the two parallel statutes was a further act of retaliation.

27. As Officer Wood handed Mr. Warner the citation, she said to him: "enjoy your $1,000 ticket."

6

## The Helicopter Pursuit

28. After Mr. Warner was cited and released, the TPD helicopter followed him approximately fifteen miles to his home. No warrant, reasonable suspicion, ongoing investigation, or officer-safety justification supported the surveillance.

29. TPD does not routinely deploy helicopters to the scene of ordinary license-plate traffic stops of passenger vehicles, let alone follow cited motorists home by helicopter afterward. TPD does, however, maintain a custom, practice, and policy of deploying helicopters in coordination with ground units against persons operating dirt bikes, and of using post-stop helicopter surveillance against such persons. That tactical model was deployed against Mr. Warner.

## The Traffic-Court Dismissal

30. Mr. Warner contested the citation in the County Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida. Case Number 25-TR-111625. On April 20, 2026, the court dismissed the citation.

## Mr. Warner's Motorcycles and the Harley Comparator

31. Mr. Warner owns five motorcycles. Each is registered in Florida and is street-legal. The motorcycles display license plates in a variety of locations — some in the standard rear-fender location, and some in non-standard locations dictated by custom fender and frame configurations. Mr. Warner routinely operates his motorcycles on Tampa's public roadways. Mr. Warner remains subject, each time he does so, to two independent layers of unchecked officer discretion. First, whether Mr. Warner will be stopped at all does not turn on whether his plate is, in fact, properly displayed — it turns on an officer's assessment of race and vehicle type. A compliant plate is no protection. TPD officers seize on any alleged plate condition, real or imagined, as a pretextual basis for a race-based

stop, and Mr. Warner's compliance with the letter of Florida's plate-display statutes does not alter his exposure to future stops. Second, once stopped, Mr. Warner is subject to the unguided roadside choice between Fla. Stat. §§ 316.605 and 316.2085(3), under which identical alleged conduct yields either a nominal non-moving infraction or a $1,000 moving violation with driver's-license points, with no legal standard governing the choice.

32. Among Mr. Warner's motorcycles is a Harley-Davidson with a chopped rear fender,[1] which results in the license plate being displayed in a non-standard position that is conspicuously less visible than the plate display on Mr. Warner's dirt bike.

33. Mr. Warner has been stopped by TPD while operating his Harley-Davidson. The response is markedly different from the November 4, 2025 response: a single officer approaches, looks at the license plate, runs the plate and Mr. Warner's driver's license, exchanges pleasantries with Mr. Warner, and releases him with, at most, a warning. No helicopter is deployed. No additional patrol units are dispatched. No extended investigative detention occurs. No post-release surveillance follows.

34. Harley-Davidson motorcycles are associated, in popular and law-enforcement parlance, both with organized outlaw motorcycle clubs and gangs — including nationally recognized motorcycle gangs known for violence, narcotics trafficking, and firearms offenses — and with white riders. Dirt bikes operated on public streets in Tampa are associated, in the same parlance, with young African-American men. Mr. Warner is the same person — same race, age, driving record, and demeanor — whether he is operating his Harley-Davidson or his dirt bike. Tampa-area law enforcement's response to Mr. Warner on the

---

[1]A "chopped" rear fender is a custom modification, common on Harley-Davidson motorcycles in the "chopper" and "bobber" styles, in which the stock rear fender is shortened or removed. Because the stock rear fender is the conventional mounting location for a license plate, a chopped fender leaves no standard location for the plate; the plate is typically relocated to the side of the swingarm or to another non-standard position.

Harley, notwithstanding the Harley's associations with organized motorcycle-gang criminal activity, is single-officer, cordial, and warning-based. TPD's response to Mr. Warner on the dirt bike on November 4, 2025 was the air-and-ground crackdown described above.

## RACIAL PROFILING OF DIRT BIKE RIDERS

35. Persons operating dirt bikes on Tampa's public streets are predominantly young African-American men. That demographic reality is reflected in and corroborated by TPD's own public-facing enforcement imagery, including the video published with TPD's August 13, 2025 Facebook post and associated photographs of the August 13, 2025 and April 14, 2025 operations, which depict predominantly Black riders; and the racial framing of the annual Martin Luther King, Jr. Day "Wheels Up, Guns Down" ride-out tradition by Florida law-enforcement officials.



36. TPD and its final policymakers are aware of that demographic reality.

37. In popular and law-enforcement parlance in Florida, the operation of dirt bikes on public streets is stereotypically associated with young African-American men

and with illegal riding, evasion, and flight from police. TPD has operationalized and publicly adopted that stereotype. TPD's August 13, 2025 Facebook post — announcing that riders on dirt bikes "can try to run. You can try to hide. But we'll be right behind you—and above you" — memorializes the framing, as do the Wheels Up, Guns Down law-enforcement statements and the April and August 2025 TPD operations.

38. Officers Wood and Rouse profiled Mr. Warner as fitting that stereotype — an African-American man on a dirt bike — and treated him in conformity with the stereotype rather than with his individualized, observable conduct. Officer Rouse's statement that the response was deployed "because you guys run," followed by his smirked answer "humans" when Mr. Warner asked what he meant by "you guys," invoked the stereotype directly: Mr. Warner had not run, had pulled over promptly when lights were activated, had cooperated throughout the stop, and had made no attempt to flee.

39. The stereotype did not match Mr. Warner. Mr. Warner's dirt bike was registered, and street-legal, and bore a valid, unobstructed Florida license plate. Mr. Warner was riding at or below the posted speed limit and in compliance with all traffic laws. Mr. Warner's Florida driver's license, which officers held in their physical possession and had run through their databases, bore a motorcycle endorsement on its face. None of the individualized facts Mr. Warner was presenting matched the stereotype TPD had publicly operationalized. Officers Wood and Rouse proceeded with the stereotyped response —- multiple patrol vehicles, a helicopter overhead, a thirty-plus-minute investigative detention, a citation on a false premise, selection of the harsher parallel statute, and fifteen miles of post-release helicopter surveillance — regardless.

40. After Mr. Warner verbally objected during the stop that the stop was racially motivated, Officers Wood and Rouse escalated rather than de-escalated their

response: Officer Wood cited Mr. Warner under Fla. Stat. § 316.2085(3) instead of § 316.605, imposing an approximately forty-fold-greater civil penalty, driver's-license points, and the quasi-criminal consequences of § 316.2085(3); Officer Wood said to Mr. Warner, "enjoy your $1,000 ticket," as she handed him the citation; and the TPD helicopter then followed Mr. Warner approximately fifteen miles to his home.

## Pattern, Policy, and Custom

41. A 2015 *Tampa Bay Times* investigation reported that, between 2003 and 2015, TPD issued more than 10,000 bicycle-related citations, approximately 79% to Black individuals, in a city approximately 25% Black. A 2016 United States Department of Justice COPS review covering January 2014 through August 2015 found that 73% of 9,121 TPD bicycle stops involved Black cyclists and issued twenty-two recommendations.

42. Each year on Martin Luther King, Jr. Day, riders on dirt bikes, all-terrain vehicles, and bicycles participate in a public ride in Florida known as "Wheels Up, Guns Down." Florida law-enforcement agencies coordinate multi-agency enforcement operations in response. On or about January 12, 2024, Florida Highway Patrol Lieutenant Alejandro Camacho publicly stated, in connection with the annual ride: "Dr. Martin Luther King's name should not be tarnished nor should his legacy be overshadowed by the chaos we've seen in the past." On or about January 16, 2026, Miami-Dade County Sheriff Rosie Cordero-Stutz publicly stated, in connection with the annual ride: "If you participate, you will be stopped, cited, arrested, and your vehicle will be impounded."

43. On or about April 14, 2025, TPD conducted an enforcement operation on the Tampa Riverwalk and in downtown Tampa directed at persons operating dirt bikes.

11

44. At approximately 7:24 p.m. on August 13, 2025, TPD conducted a coordinated air-and-ground enforcement operation against a group of more than 200 persons riding dirt bikes on Tampa streets. TPD deployed a police helicopter and multiple ground units. TPD arrested four persons, issued seven citations for reckless driving, and announced that additional arrests were pending and that the helicopter footage was being reviewed to identify additional persons. The riders ranged in age from 16 to 29. TPD Major Les Richardson publicly described the operation and stated that TPD was reviewing "hours of helicopter footage" and relies on "social media" to "charg[e] accordingly."

45. On August 13, 2025, TPD published on its official Facebook account a statement describing the operation and the tactical model TPD deploys against dirt-bike riders, stating in pertinent part: "Our eyes in the sky and boots on the ground worked together to track them down. You can try to run. You can try to hide. But we'll be right behind you—and above you."

46. Upon information and belief, TPD has no written policy guiding officer discretion between Fla. Stat. §§ 316.605 and 316.2085(3), and no training adequate to prevent retaliation against motorists who voice First Amendment-protected objections to police conduct.

47. TPD maintains an affirmative custom, practice, and policy of deploying its helicopter in coordination with multiple ground units against persons operating dirt bikes, and of using post-stop helicopter surveillance to track and pursue those persons after release.

48. The City's final policymakers have actual or constructive knowledge of each of the patterns, customs, practices, and policy absences described above, and have ratified them or failed to implement adequate remedial policies, training, or supervision.

## FHP Enforcement on Mr. Warner's Route and in His Area of Residence

49. The Florida Highway Patrol, operating under the authority of the FDHSMV Executive Director, enforces Fla. Stat. §§ 316.605 and 316.2085(3) on Florida's state highways, state roads, and in unincorporated areas of Florida's counties.

50. West Gandy Boulevard — the road at which Officers Wood and Rouse stopped Mr. Warner on November 4, 2025 — is a major arterial in the Tampa Bay area and a regular situs of FHP traffic-enforcement activity. FHP troopers routinely patrol W. Gandy Boulevard for traffic enforcement, including license-plate and motorcycle enforcement under Fla. Stat. §§ 316.605 and 316.2085(3).

51. Mr. Warner resides in unincorporated Hillsborough County, Florida, within FHP's regular traffic-enforcement jurisdiction. Each time Mr. Warner operates one of his motorcycles from his residence onto the public roadways of Florida, he is subject to stop and citation by FHP troopers under the authority of the FDHSMV Executive Director.

## Injury

52. As a direct and proximate result of *Defendants*' conduct, Mr. Warner suffered deprivation of liberty during the stop; loss of use and possession of his second motorcycle; exposure to a $1,000 civil penalty, moving-violation classification, driver's-license points, and associated collateral consequences that a lawful, non-retaliatory charging decision would not have carried; the time and expense of successfully contesting the citation; humiliation and emotional distress from a disproportionate show of force and a fifteen-mile post-release helicopter pursuit; chilling of his exercise of First Amendment rights; and dignitary harm from race-based enforcement.

13

# COUNTS

## COUNT I

### *42 U.S.C. § 1983 — Fourth Amendment: Unreasonable Seizure (Pretextual Stop) — Against Officers Wood and Rouse*

53. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

54. Officers Wood and Rouse stopped Mr. Warner without reasonable suspicion or probable cause of any traffic violation. The plate was visible and compliant with Florida law. The stop was an unreasonable seizure of Mr. Warner's person in violation of the Fourth Amendment.

55. Mr. Warner suffered the damages alleged above as a direct and proximate result.

## COUNT II

### *42 U.S.C. § 1983 — Fourth Amendment: Unlawful Extension of Stop — Against Officers Wood and Rouse*

56. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

57. Officers Wood and Rouse detained Mr. Warner at the roadside for more than thirty minutes on the stated ground of an alleged license-plate violation. Officers extended the stop beyond the time reasonably necessary to verify the plate and issue a citation, pursued investigative inquiries unrelated to the stated mission of the stop, and refused Mr. Warner's repeated requests to be released. No reasonable suspicion of any other offense supported the extension. The extended

14

detention was an unreasonable seizure of Mr. Warner's person in violation of the Fourth Amendment.

58. Mr. Warner suffered the damages alleged above as a direct and proximate result.

## COUNT III

*42 U.S.C. § 1983 — Fourth Amendment: Unlawful Seizure of the Second Motorcycle —*
*Against Officers Wood and Rouse*

59. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

60. Officers Wood and Rouse seized Mr. Warner's second motorcycle without reasonable suspicion or probable cause. They stopped the second motorcycle, told its rider he was not free to leave, and detained the motorcycle at the scene for the duration of the encounter. The seizure meaningfully interfered with Mr. Warner's possessory interest in his property and was unreasonable in violation of the Fourth Amendment.

61. Mr. Warner suffered the damages alleged above as a direct and proximate result.

## COUNT IV

*42 U.S.C. § 1983 — First Amendment: Retaliation — Against Officers Wood and Rouse*

62. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

63. Mr. Warner's verbal objection, during the stop, that the stop was pretextual and racially motivated was speech protected by the First Amendment.

15

64. Because Mr. Warner's license plate was visible and compliant with Florida law, no lawful basis existed to issue any citation to Mr. Warner, under Fla. Stat. § 316.605 or Fla. Stat. § 316.2085(3) or any other provision. The decision to issue any citation at all was made in retaliation for Mr. Warner's protected speech.

65. In further retaliation for Mr. Warner's protected speech, officers extended the roadside detention beyond the time necessary to verify the plate and issue any citation, pursuing investigative inquiries unrelated to the stated mission of the stop; Officer Wood selected Fla. Stat. § 316.2085(3) rather than § 316.605, increasing the civil penalty approximately forty-fold and imposing driver's-license points and the quasi-criminal consequences of § 316.2085(3); contemporaneously with the citation, Officer Wood said to Mr. Warner, "enjoy your $1,000 ticket"; and, following Mr. Warner's release, the TPD helicopter followed him approximately fifteen miles to his home.

66. Officers Wood and Rouse took each of these actions because of Mr. Warner's protected speech. Each action would deter a person of ordinary firmness from engaging in similar speech.

67. Mr. Warner suffered the damages alleged above as a direct and proximate result.

## COUNT V
### *42 U.S.C. § 1983 — Fourteenth Amendment: Equal Protection — Selective Enforcement on the Basis of Race — Against Officers Wood and Rouse*

68. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

69. Officers Wood and Rouse acted with discriminatory purpose on the basis of race. Officer Rouse's "because you guys run" statement and his smirked "hu-

16

mans" answer; Officer Wood's "enjoy your $1,000 ticket" statement following Mr. Warner's racial-profiling objection; officers' application of TPD's dirt-bike-rider stereotype rather than Mr. Warner's individualized and contrary conduct; the post-objection escalation; and the Harley-Davidson comparator all supply the direct and circumstantial evidence of that purpose.

70. Officers' conduct had a discriminatory effect. Similarly situated motorcyclists who do not fit TPD's operationalized stereotype — including Mr. Warner himself on his Harley-Davidson — are not stopped, detained, subjected to a comparable show of force, investigated at length, cited, charged under the harsher parallel statute, or surveilled post-release on the same facts.

71. Officers Wood and Rouse thereby violated Mr. Warner's rights under the Equal Protection Clause of the Fourteenth Amendment. Mr. Warner suffered the damages alleged above as a direct and proximate result.

## COUNT VI
### *42 U.S.C. § 1983: Violation of Rights Guaranteed by 42 U.S.C. § 1981 — Full and Equal Benefit of the Laws — Against Officers Wood and Rouse*

72. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

73. 42 U.S.C. § 1981(a) guarantees that all persons shall have "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

74. Officers Wood and Rouse intentionally discriminated against Mr. Warner on the basis of race in the enforcement of Florida's traffic laws when they stopped, detained, investigated, cited, and selected the harsher parallel statute against him

because he is an African-American man on a dirt bike. Officers thereby denied Mr. Warner the full and equal benefit of Florida's laws for the security of persons and property as is enjoyed by white citizens.

75. Mr. Warner suffered the damages alleged above as a direct and proximate result.

## COUNT VII
### *42 U.S.C. § 1983 — Municipal Liability: Against the City of Tampa*

76. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

77. The City of Tampa, through TPD, maintains a longstanding custom and practice of race-based enforcement of minor vehicle-display and traffic laws against African-American dirt-bike riders.

78. The City has failed to adopt any policy governing officer discretion between Fla. Stat. §§ 316.605 and 316.2085(3), and has failed to train officers not to retaliate against motorists for First Amendment-protected objection to police conduct. The City, through TPD, has also adopted and maintained an affirmative custom, practice, and policy of deploying helicopters in coordination with ground units against persons operating dirt bikes, and of using post-stop helicopter surveillance against such persons after release.

79. The City's final policymakers have actual and constructive knowledge of the foregoing custom and of the racially disparate enforcement it produces, including by reason of the 2015 *Tampa Bay Times* investigation and the 2016 United States Department of Justice COPS review and its twenty-two recommendations. The City's final policymakers have adopted, maintained, and ratified the

18

custom with the purpose of continuing race-based enforcement against African-American residents, and with deliberate indifference to the constitutional rights of persons with whom TPD comes into contact.

80. The City's customs and failures were the moving force behind the constitutional violations alleged in Counts I through VI.

81. Mr. Warner suffered the damages alleged above as a direct and proximate result.

## COUNT VIII
### *42 U.S.C. § 1983 — Municipal Liability: TPD Policy of Aggressive Enforcement Against Dirt Bike Riders — Against the City of Tampa*

82. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

83. The City of Tampa, through TPD, has adopted and maintained a custom, practice, and policy of targeting persons operating dirt bikes on Tampa streets as a category for aggressive, disproportionate enforcement. The custom includes coordinated air-and-ground operations with helicopter surveillance, multi-unit ground responses to individual traffic stops of dirt-bike riders, prolonged investigative detentions of dirt-bike riders beyond the stated mission of the stop, post-stop helicopter surveillance of released dirt-bike riders, and pretextual vehicle-display and license-plate enforcement as a basis to initiate stops of dirt-bike riders.

84. The custom, practice, and policy is memorialized in TPD's own official public statements, including the August 13, 2025 TPD Facebook post quoted above, TPD Major Les Richardson's public descriptions of the August 13, 2025 operation, and the April 14, 2025 TPD Riverwalk operation. It was deployed against

19

Mr. Warner on November 4, 2025 in the stop, extended detention, citation, and post-release helicopter surveillance described above.

85. The City's final policymakers have adopted, approved, and ratified the custom, and have maintained it in the face of documented evidence — including the 2015 *Tampa Bay Times* investigation and the 2016 United States Department of Justice COPS review — that the custom produces race-based and pretextual enforcement disproportionately affecting African-American residents. The City's adoption and maintenance of the custom in the face of that evidence is with deliberate indifference to the constitutional rights of persons operating dirt bikes on Tampa streets.

86. The City's custom, practice, and policy was the moving force behind the constitutional violations inflicted upon Mr. Warner — the Fourth Amendment violations alleged in Counts I through III, the First Amendment retaliation alleged in Count IV, and the Fourteenth Amendment Equal Protection and 42 U.S.C. § 1981 violations alleged in Counts V and VI.

87. Mr. Warner suffered the damages alleged above as a direct and proximate result.

## COUNT IX
*28 U.S.C. §§ 2201–2202 and 42 U.S.C. § 1983 — Fourteenth Amendment Due Process: Void for Vagueness — Fair Notice — Facial and As-Applied Challenge to Fla. Stat. § 316.2085(3) — Against the City of Tampa and the FDHSMV Executive Director*

88. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

89. Mr. Warner was cited under Fla. Stat. § 316.2085(3). He remains exposed to the statutory scheme and to the two stages of unguided officer discretion pleaded above each time he operates a motorcycle on Florida's public roadways.

20

90. The statutory scheme does not tell a motorcyclist, in advance of an alleged infraction, whether his conduct exposes him to a nominal fine under § 316.605 or to the $1,000 penalty, driver's-license points, and quasi-criminal consequences of § 316.2085(3). Fla. Stat. § 316.2085(3), as part of that scheme, fails to provide constitutionally adequate notice of the penalty attached to the prohibited conduct, and is unconstitutionally vague on its face and as applied to Mr. Warner under the Due Process Clause of the Fourteenth Amendment.

91. Mr. Warner seeks a declaratory judgment to that effect and such prospective injunctive relief as this Court deems appropriate.

## COUNT X

*28 U.S.C. §§ 2201–2202 and 42 U.S.C. § 1983 — Fourteenth Amendment Due Process: Void for Vagueness — Standardless Enforcement — Facial and As-Applied Challenge to Fla. Stat. § 316.2085(3) — Against the City of Tampa and the FDHSMV Executive Director*

92. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

93. Mr. Warner was cited under Fla. Stat. § 316.2085(3). He remains exposed to the statutory scheme and to the two stages of unguided officer discretion pleaded above each time he operates a motorcycle on Florida's public roadways.

94. The scheme commits the choice between the two parallel statutes to the unguided discretion of the citing officer, with no legal standard governing that choice. Fla. Stat. § 316.2085(3), as part of that scheme, authorizes arbitrary and discriminatory enforcement of the law, and is unconstitutionally vague on its face and as applied to Mr. Warner under the Due Process Clause of the Fourteenth Amendment.

95. Mr. Warner seeks a declaratory judgment to that effect and such prospective injunctive relief as this Court deems appropriate.

## COUNT XI

*28 U.S.C. §§ 2201–2202 and 42 U.S.C. § 1983 — Fourteenth Amendment Equal Protection: Facial and As-Applied Challenge to Fla. Stat. § 316.2085(3) — Against the City of Tampa and the FDHSMV Executive Director*

96. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

97. Mr. Warner was cited under Fla. Stat. § 316.2085(3). He remains exposed to the statutory scheme and to the two stages of unguided officer discretion pleaded above each time he operates a motorcycle on Florida's public roadways.

98. The scheme permits identically situated motorcyclists to receive radically disparate penalties for functionally identical conduct, based solely on the officer's unguided selection between the two parallel statutes. Fla. Stat. § 316.2085(3), as part of that scheme, denies equal protection of the laws to motorcyclists on its face and as applied to Mr. Warner under the Equal Protection Clause of the Fourteenth Amendment.

99. Mr. Warner seeks a declaratory judgment to that effect and such prospective injunctive relief as this Court deems appropriate.

## COUNT XII

22

*28 U.S.C. §§ 2201–2202 and 42 U.S.C. § 1983 — Fourteenth Amendment Due Process: Void for Vagueness — Ambiguous Plate-Display Requirement — Facial and As-Applied Challenge to Fla. Stat. §§ 316.605 and 316.2085(3) — Against the City of Tampa and the FDHSMV Executive Director*

100. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

101. Mr. Warner was cited under Fla. Stat. § 316.2085(3). Mr. Warner owns five registered and street-legal motorcycles, which display license plates in a variety of standard and non-standard locations, and Mr. Warner routinely operates his motorcycles on Tampa's public roadways. Each time he does so, he is subject to the plate-display requirements of Fla. Stat. §§ 316.605 and 316.2085(3).

102. Fla. Stat. § 316.605(1) applies to every vehicle, including motorcycles, and requires that the license plate be "securely fastened to the vehicle outside the main body of the vehicle not higher than 60 inches and not lower than 12 inches from the ground and no more than 24 inches to the left or right of the centerline of the vehicle, and in such manner as to prevent the plates from swinging, and all letters, numerals, printing, writing, the registration decal, and the alphanumeric designation shall be clear and distinct and free from defacement, mutilation, grease, and other obscuring matter. The plates shall be plainly visible and legible at all times 100 feet from the rear or front."

103. Fla. Stat. § 316.2085(3) imposes additional, motorcycle-specific plate-display requirements: "The license tag of a motorcycle or moped must be permanently affixed to the vehicle and remain clearly visible from the rear at all times. Any deliberate act to conceal or obscure the legibility of the license tag of a motorcycle is prohibited." The statute authorizes a motorcycle plate to be affixed either horizontally (with numbers and letters read left-to-right) or perpendicularly (with numbers and letters read top-to-bottom).

23

104. Neither statute defines "obscuring matter," "plainly visible," "legible," "defacement," "clearly visible from the rear at all times," or "deliberate act to conceal or obscure the legibility." Neither statute addresses custom fender or frame configurations that dictate non-standard plate positions. Neither statute specifies the lighting, viewing angle, weather, time-of-day, or other conditions under which the "plainly visible at 100 feet" and "clearly visible from the rear at all times" requirements are measured. Neither statute specifies what degree or type of obstruction constitutes "obscuring matter" or conceal[ment]. A Florida motorcyclist cannot determine, in advance and from the text of either statute, whether a given plate mounting, finish, angle, cover, fender configuration, or surrounding bodywork complies with the statutes.

105. Fla. Stat. §§ 316.605 and 316.2085(3) fail to give fair notice to motorcyclists — and particularly to motorcyclists whose bikes have non-standard plate locations dictated by custom fender or frame configurations — of what plate display is legal and what is not.

106. The ambiguity of the plate-display requirements permits officers to initiate stops on the stated ground of plate non-compliance even when the plate is, in fact, compliant, using the ambiguous requirements as pretext for investigation into other matters, including matters influenced by the officer's racial stereotyping of the rider. Officers Wood and Rouse stopped Mr. Warner on the stated ground that his plate was not visible. The plate was visible, properly mounted, and compliant with Florida law.

107. Fla. Stat. §§ 316.605 and 316.2085(3), in their plate-display requirements, are unconstitutionally vague on their face and as applied to Mr. Warner under the Due Process Clause of the Fourteenth Amendment, in that the statutes fail to provide fair notice of the conduct they prohibit and authorize arbitrary and discriminatory enforcement.

24

108. Mr. Warner seeks a declaratory judgment to that effect and such prospective injunctive relief as this Court deems appropriate.

# COUNT XIII

*28 U.S.C. §§ 2201–2202 and 42 U.S.C. § 1983 — Fourteenth Amendment Equal Protection: Disparate Treatment of Motorcyclists — Facial and As-Applied Challenge to Fla. Stat. § 316.2085(3) — Against the City of Tampa and the FDHSMV Executive Director*

109. Mr. Warner re-alleges and incorporates by reference ¶¶ 1–52 as if fully set forth herein.

110. Mr. Warner was cited under Fla. Stat. § 316.2085(3). He remains exposed to that statute each time he operates a motorcycle on Florida's public roadways.

111. For the same base plate-display obligation applicable to every motor vehicle operator, a motorcyclist is subject to additional motorcycle-specific requirements and, if charged under § 316.2085(3), to an approximately forty-fold-greater civil penalty, moving-violation classification, driver's-license points, and the attendant collateral consequences. The governmental purposes of plate-display regulation — vehicle identification, registration verification, and traffic enforcement — apply equally to motorcycles and to other motor vehicles. No rational basis supports the disparate treatment of motorcyclists relative to operators of other motor vehicles. Fla. Stat. § 316.2085(3), as part of the statutory scheme, denies equal protection of the laws to motorcyclists on its face and as applied to Mr. Warner under the Equal Protection Clause of the Fourteenth Amendment.

112. Mr. Warner seeks a declaratory judgment to that effect and such prospective injunctive relief as this Court deems appropriate.

25

## DAMAGES

113. As a direct and proximate result of *Defendants'* conduct, Mr. Warner is entitled to the following, in amounts to be proven at trial:

   (a) Nominal damages on each of Counts I through VIII.

   (b) Compensatory damages, including for humiliation, emotional distress, fear, intimidation, loss of liberty, loss of use and possession of property, chilling of First Amendment exercise, exposure to the $1,000 civil penalty, driver's-license points and collateral consequences, and the costs of successfully contesting the citation.

   (c) Punitive damages against Officers Wood and Rouse in their individual capacities.

   (d) Taxable costs under 42 U.S.C. § 1988 and Fed. R. Civ. P. 54(d).

## PRAYER FOR RELIEF

114. Wherefore, Mr. Warner respectfully requests that this Court enter judgment in his favor and grant:

   A. A declaratory judgment that Officers Wood and Rouse violated Mr. Warner's rights under the First, Fourth, and Fourteenth Amendments and 42 U.S.C. §§ 1981 and 1983;

   B. A declaratory judgment that the City of Tampa violated Mr. Warner's rights under the First, Fourth, and Fourteenth Amendments and 42 U.S.C. §§ 1981 and 1983;

   C. A declaratory judgment, on Counts IX through XIII, enforceable against the City of Tampa and the FDHSMV Executive Director, that Fla. Stat. §§ 316.605 and 316.2085(3), including as part of the scheme comprising those two statutes, are unconstitutional on their face and as applied to Mr. Warner

26

under the Due Process and Equal Protection Clauses of the Fourteenth Amendment;

D. Nominal damages on each count of at least $1.00 per violation;

E. Compensatory damages against Officers Wood, Rouse, and the City of Tampa, in amounts to be proven at trial;

F. Punitive damages against Officers Wood and Rouse in their individual capacities;

G. A permanent injunction, to the extent this Court deems appropriate, enjoining the City of Tampa and the FDHSMV Executive Director from enforcing Fla. Stat. § 316.605 and/or Fla. Stat. § 316.2085(3) against Mr. Warner;

H. Taxable costs under 42 U.S.C. § 1988 and Fed. R. Civ. P. 54(d);

I. Pre-judgment and post-judgment interest as allowed by law; and

J. Such other and further relief as the Court deems just and proper.

27

## JURY DEMAND

Mr. Warner demands a trial by jury on all issues so triable.

April 23, 2026
_____

Date

/s/blake warner
_____

Signature

Blake Warner, *pro se*

2211 S. Village Ave

Tampa, FL 33612

Telephone: (212) 542-0055

E-Service: blake@null3d.com